IOWA 80 GROUP, INC. & SUBSIDIARIES (Formerly Iowa 80 Truckstop, Inc. and Subsidiaries), Plaintiff,

v.

**UNITED STATES of America, Defendant.**

No. 3:00–CV–90217.

United States District Court, S.D. Iowa, Davenport Division.

May 23, 2002.

Gene H. Snapp, Jr., John S. Gosma, Davenport, IA, for Plaintiff.

Joan Stentiford Ulmer, Tax Division, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

The Plaintiff, Iowa 80 Group, Inc. ("Iowa 80") brought this action against the United States for a taxpayer refund pursuant to 26 U.S.C. § 7422. The United States now moves for summary judgment and for the foregoing reasons, the motion is granted in part and denied in part.

## I. Factual Background

Through its subsidiaries, Iowa 80 owns truck stops in Walcott, Iowa and Joplin, Missouri. The Walcott, Iowa facility consists of a Main Building, a building referred to as the Old Headquarters Building, a Fuel Center, a Truckomat, and a Service Center. On the first floor of the Main Building, there is a sit-down restaurant, a Wendy's restaurant, Dairy Queen restaurant, a retail store known as the Chrome Shop, public telephones, video games, and public restrooms. The Chrome Shop sells truck replacement parts such as lights, light bulbs, brake lights, straps to use as load controls, fuses, switches, wiper blades, and other minor replacement parts. The first floor also contains what William Moon, Iowa 80's President and CEO, describes in his depo-

sition as a small convenience store, which sells products that range from packaged food and convenience items to automotive-related products such as seatbelt straps, vanity mirrors, air fresheners, motor oil, or windshield wiper blades.[1] Next to this store are cashiers where customers pay for store purchases or gasoline.

On the second floor of the Main Building, there is a TV lounge, a one screen movie theater that seats approximately 40, 22 or 23 individual shower rooms, more public telephones, a coin operated laundry facility, a dentist's office, a barber shop, an area used as a chapel, and office space for Iowa 80 employees. There are gasoline pumps adjacent to the Main Building. In addition, there are 16 diesel pumps behind the Old Headquarters Building, which is itself behind the Main Building. There is no designated walkway from the diesel pumps to the Main Building. The diesel pumps are primarily served by the Fuel Center, which contains a Blimpie's restaurant, public telephones, and restrooms and sells small truck parts as well as snacks and other convenience items. Iowa 80 admits that in 1996 the amount of gross revenue in the Main Building in Walcott from the sale of petroleum and petroleum-related products was $2,574,609 and the amount of gross revenues from tenants was $4,111,542.[2] Of the tenants, only the

1. In its response to the Statement of Material Facts Not in Dispute filed by the United States, Iowa 80 objects to the use of the term "convenience store" and "convenience," "as that phrase was used as a term of art in the 1995 Paper issued by the Internal Revenue Service ... The precise meaning of these words and phrases in the context of this case must be determined by the Court." For reasons the Court will discuss, the Court does not find it necessary to determine such a precise construction of the term "convenience" or avoid its usage in the context of the sale of convenience items. Mr. Moon referred to the retail operation in the Walcott Main Building as a "convenience store," and Iowa 80 admits that the store contained "paper products, pens, pencils, erasers ... soda

pop, juice, milk, cold cuts, sandwiches, bagged candy, snack candy, an assortment of health and beauty aids, aspirin, Tylenol, Chapstick, shampoo, shaving cream, razor blades, assorted snack items: beef jerky, and bottled water." The Court does not believe that the collective referral to this assortment of goods as "convenience items" sold in a "convenience store" ultimately affects the outcome in this case.

2. Iowa 80 denies the overall revenue figure offered by the United States in its Statement of Material Facts Not in Dispute, arguing that certain revenues from other structures at the Walcott location were not separated from those attributed to the Main Building in Walcott. Upon reviewing the Appendix submitted by the United States and Iowa 80's discov-

CAT Scale Company and Trucker's Voice in Court provided automobile or trucking-related services. Revenues in the Main Building in Walcott attributable to tenants other than those services totaled $3,832,104.

The Joplin, Missouri installation consists of a Main Building, a Fuel Center, a Truck Wash, a Service Center, and an above-ground diesel fuel tank. There are five gasoline pumps adjacent to the Main Building in Joplin that can serve ten automobiles at once. Customers purchase the gasoline at a cashier station inside the Main Building. The Main Building in Joplin also includes a small movie theater, a retail area selling convenience items, a video game room, a restaurant, public showers, public telephones, a laundromat, a TV room, and office space for Iowa 80 employees. Located across the parking lot from the Main Building in Joplin, the Fuel Center has 12 diesel fuel pumps as well as a retail space selling snacks, sandwiches, and various driver supplies. The Fuel Center in Joplin also contains public telephones and restrooms.[3]

In July 1997, Iowa 80 filed an administrative claim for refund with the Internal Revenue Service (the "IRS") by submitting an Amended Corporate Income Tax Return (Form 1140X). The claim for refund was based on Iowa 80's claim that it was entitled to depreciate the Main Buildings at its facilities in Walcott, Iowa and Joplin, Missouri on a 15 year schedule due to their alleged status as "retail motor fuel outlets." Iowa 80 is currently allowed to depreciate the Main Buildings on a sched-

ule that is over 30 years. In the denial of that claim, the IRS agent assigned to the claim, Steve Kueter, noted that "the tax-payer cannot meet the floor space test based on the amount of the buildings devoted to activities unrelated to petroleum marketing such as restaurants, fast food outlets and other activities mentioned above. It is believed that the taxpayer will not attempt to show that this test could be met." Iowa 80 has not in this litigation identified any document that it submitted pursuant to its administrative claim or its appeal where it asserts that the buildings in question devote more than 50% of their floor space to the marketing of petroleum or petroleum-related products or that provides any evidence to that effect.

## II. Applicable Standard

The purpose of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to [conserve] scarce judicial resources." *Id.*

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the

---

ery responses, it appears to the Court that this is true with respect to non-petroleum retail sales. On the other hand, upon reviewing the same materials, it appears clear that the revenues attributable to tenants and gasoline sold in the Main Building in Walcott are accurate.

**3.** The United States has asserted petroleum-related and non-petroleum related gross reve-

nues attributable to the Main Building in Joplin for 1996; however, the Court is unable to verify the revenue figures offered by the United States for non-petroleum related gross revenues. Furthermore, Iowa 80 claims the petroleum-related revenue figured offered by the United States do not include diesel fuel, which customers were able to purchase in the Main Building in Joplin.

light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cited in Handeen v. Lemaire*, 112 F.3d 1339, 1345 (8th Cir.1997); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. Fed.R.Civ.P. 56(c), (e); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

■ In a federal tax refund suit such as this one "it is incumbent upon the claimant to show that the United States has money which belongs to him." *Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932); see also *United States v. Pfister*, 205 F.2d 538, 542 (8th Cir.1953). The taxpayer must sustain its burden and show that the initial determination of the IRS was wrong and must show "the essential facts from which a correct determination of his liability can be made." *Roybark v. United States*, 104 F.Supp. 759, 762 (S.D.Cal.1952); see also *Pfister* at 542. As part of this burden, the taxpayer must produce evidence to substantiate all aspects of a claim for refund. *Owen v. United States*, 34 F.Supp.2d 1071, 1073 (W.D.Tenn.1998).

## III. Discussion

Professor Marvin Chirelstein opens the section on depreciation in his treatise by stating that "[t]hough not the sort of topic that lawyers love, the depreciation allowance has grown so important over the past couple of decades that a somewhat lengthy discussion of it appears unavoidable." MARVIN A. CHIRELSTEIN, FEDERAL INCOME TAXATION 148 (8th ed.1997). Since this dispute revolves around the depreciation treatment of two particular buildings owned by Iowa 80, a general discussion of the concept seems unavoidable here as well.

When a business purchases a capital asset that remains useful over a period of years, the business may not deduct the entire cost in the year of purchase and thus reap all of the benefit of showing lower taxable income in that initial year. Instead, the business must spread the cost of the asset over the course of the asset's useful life, as determined by the Internal Revenue Code, and thus spread the tax benefits of showing less income over sever-

al years. This process is known as depreciation. Financial benefits in the present year are almost always more valuable than financial benefits in the future, consequently, if a business can depreciate an asset over a shorter period, and thus deduct more costs sooner, the business will derive more value from the tax benefits that arise from deducting the cost of the asset. Hence, Iowa 80 is vigorously contesting whether it may deduct the cost of its Main Buildings in Walcott and Joplin over the course of 15 years instead of over 30.

"[T]he Code in 1981 pretty well abandoned the notion that depreciation should be spread out over an asset's *true* useful life and instead permits business taxpayers to depreciate their property over periods that are (and are expected to be) much shorter than the periods of actual service." CHIRELSTEIN at 150. Under the United States Internal Revenue Code, as amended by the Small Business Job Protection Act of 1996, a "retail motor fuels outlet" is classified as a "15 year property," thus a taxpayer may depreciate the cost of that property over 15 years. 26 U.S.C. § 168(e)(3)(E)(iii).

In March 1995, the IRS promulgated a policy statement, also referred to as a "Coordinated Issues Paper" or the "March 1, 1995 ISP Paper" (the "1995 IRS Paper") in which it clarified what structures related to the marketing of petroleum, particularly gas station convenience stores, would receive classification as a property depreciable over the course of 15 years, instead of over 30. The 1995 IRS Paper set forth a two-prong test (the "Two–Prong test") in order to determine whether a building is primarily used in petroleum marketing.

1. Is 50 percent or more of the gross revenues generated by the [convenience store] derived from gasoline sales, and

2. Is 50 percent or more of the floor space in the building (including restrooms, counters, and other areas allocable to traditional service station "services") devoted to the petroleum marketing activity?

March 1, 1995 ISP Paper. In promulgating this test, the paper also cited "critical factors" that motivate a finding that a gas station convenience store building is not susceptible to the same tax treatment as structures devoted to the marketing of petroleum and petroleum-related products.

Critical factors in finding that the [convenience store] building is not a service station building are the facts that the [convenience store] does not possess any of the traditional attributes of a service station and that the [convenience store] building is not a special purpose structure. The [convenience store] building is a fully adaptable retail building that competes with other convenience stores and small grocery stores. Competitors who are not in the oil and gas business provide the same services in similar physical structures.

*Id.* Having discussed these factors, the paper noted that "a building can still be included [as a 15 year asset] if it is primarily used in petroleum marketing." *Id.* Thus, the paper does not seek to assay whether a business operating on the premises of a gas station is a convenience store or a service station building, rather, it seeks to determine whether such a business is "primarily used in petroleum marketing." For this purpose, the paper sets forth the Two Prong test discussed above. At no point does the paper create a mechanism by which the IRS would or would not classify a business operating on the premises on a gas station as a convenience store according to the "critical factors" discussion in the paper. Indeed, the statute itself makes clear that taxpayers and the IRS could classify a property as a "retail motor fuels outlet (whether or not food or

other convenience items are sold at the outlet)." 26 U.S.C. § 168(e)(3)(E)(iii).

The only guidance Congress provides for the meaning of the term "retail motor fuels outlet" in 26 U.S.C. § 168(e)(3)(E)(iii) is in the Senate Committee Report to the Small Business Job Protection Act of 1996 which modified the Internal Revenue Code.

> The Committee wishes to clarify what types of property qualify as a retail motor fuels outlet.... [P]roperty will so qualify if it meets a 50–percent test. The 50 percent test is met if: (1) 50 percent or more of the gross revenues that are generated from the property are derived from petroleum sales *or* (2) 50 percent or more of the floor space in the property is devoted to petroleum marketing sales. The Committee intends that the determination of whether either prong of this test is met will be made pursuant to the recent Coordinated Issue Paper. *Property not meeting the test will not qualify as a retail motor fuels outlet.* ... The Committee intends that, with respect to property placed in service in taxable years that ended before the date of the enactment of the provision, the determination of whether the property meets the 50–percent test generally will be made in a manner consistent with the manner in which the 50–percent test of the Coordinated Issues Paper is applied (but by using the disjunctive test intend by the Committee rather than the conjunctive test of the Paper.)

Senate Committee Report P.L. 104–188 (emphasis added). Thus Congress sought to alter the test promulgated by the IRS in the 1995 IRS Paper only by making the Two Prong test disjunctive instead of conjunctive. Congress did not see fit to alter the test in any other way, such as narrowing its application to properties that fall within the ambit of the 1995 IRS Paper's preliminary "critical factors" discussion.

In the wake of the 1996 tax legislation and the accompanying legislative history that commented upon the issue of when a property qualifies for depreciation treatment as a "retail motor fuels outlet," the IRS revisited the issue in a second policy paper in April 1997 (the "1997 IRS Paper"). April 2, 1997 ISP Paper. The paper makes the Two Prong test disjunctive instead of conjunctive. It also removes from the "critical factors" discussion without comment the language to the effect that "[t]he [convenience store] building is a fully adaptable retail building that competes with other convenience stores and small grocery stores. Competitors who are not in the oil and gas business provide the same services in similar physical structures." Finally, the paper clarifies how the IRS and taxpayers should measure the gross revenues that are derived from a property. "Gross revenues should be analyzed on a building-by-building basis. Buildings with multiple businesses should include revenue of all the business activities owned or operated by the owner of the building. Of course, each other building located at the [convenience store] site should be classified according to its primary use." *Id.*

In the case at bar, Iowa 80 offers several different bases for its argument that the Main Buildings in Walcott, Iowa and Joplin, Missouri are "retail motor fuels outlets" and are thus entitled to more preferable tax treatment. First, Iowa 80 claims that the assets in question derive more than 50% of their gross revenues from petroleum and petroleum-related products. In doing so, Iowa 80 argues that it is inappropriate to separate the revenues derived from the Main Buildings in Walcott and Joplin from the revenues derived from the other buildings at those truckstops. Iowa 80 based its original administrative claim with the IRS on this argument.

Iowa 80 now raises two other reasons why the Main Buildings in Walcott and Joplin are "retail motor fuel outlets." Iowa 80 argues that the Main Buildings satisfy the alternative, 50% floor space test, which requires a building to devote more than 50% of its floor space to the marketing of petroleum or petroleum-based products. Iowa 80 also argues that the Main Buildings meet what it calls the "five critical factors" test, which it believes is supported by the 1995 IRS Paper.

## A. The 50% Gross Revenue Test

■ Iowa 80 argues that it is improper to restrict the measurement of gross revenues to those derived from the Main Buildings in Walcott and Joplin. Instead Iowa 80 argues the IRS should measure the gross revenues attributable to the entire Walcott and Joplin installations respectively. Iowa 80 further argues that the use of the term "retail motor fuels outlet" plainly encompasses properties with multiple buildings that are taken together. In doing so, Iowa 80 proffers the Webster's definition of "outlet" as a "market for a commodity."

This Court does not agree that it can conclude that "retail motor fuels outlet" can encompass several buildings under the plain meaning of § 168(e)(3)(E)(iii). The fact that "outlet" means a "market for a commodity" does not shed light on the meaning of "retail motor fuels outlet." Indeed, different buildings at a truckstop could contain different markets. Moreover, Iowa 80's interpretation of the term "retail motor fuels outlet" would result in the failure of certain commonsense applications of this statute. For instance, if a truckstop contained on its property certain non-petroleum businesses that exceeded the gross revenues of its petroleum sales, none of the truckstop's facilities related to the sales of petroleum would benefit from the treatment as a property depreciable over 15 years. Alternatively, if the truck-

stop was considered a "retail motor fuels outlet" but sold a part of its property with a non-petroleum related business, the tax treatment of the non-petroleum related business would as a "retail motor fuels outlet," would change even though there was no substantive change to the property. In fact, the resulting change in tax treatment could easily inhibit what would otherwise be an economically efficient transaction.

Since § 168(e)(3)(E)(iii) is not susceptible to a plain meaning interpretation, the Court must rely on the Senate Committee report that accompanied the legislation. This report explicitly endorsed the approach of the 1995 IRS Policy Paper, with the exception of altering the Two Prong test from conjunctive to disjunctive. For its part, the 1995 IRS Policy Paper specifically addresses the question of truck stops or gas stations with multiple buildings on the premises. "Of course, any other building located at the [convenience store] site should be classified according to its use." March 1, 1995 ISP Paper. This statement can only have meaning if the Paper's approach is to apply the Two Prong test building-by-building. Furthermore, the 1995 IRS Paper repeatedly refers to the convenience store at issue as the "C-store building." *Id.* When the Senate revisited this approach in its Committee report, it only changed the Two Prong test from conjunctive to disjunctive, it did not find it necessary to address the building-by-building approach.

■ Iowa 80 also questions the interpretation of the 1997 IRS policy paper, which explicitly states that "gross revenues should be analyzed on a building-by-building basis," arguing that "the IRS may not legislate." While it is true that the IRS may not legislate, it may make its own best efforts to construe federal legislation in promulgating its own policies. More

importantly, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also *United States v. Boyle,* 469 U.S. 241, 247, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (applying *Chevron* to an Internal Revenue regulation). While a policy statement such as the 1997 IRS paper does not take on the force of law of a regulation, and is therefore not entitled to the deference accorded under *Chevron,* it is entitled to some deference and respect, to "to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). "[D]ue weight is given to the IRS's interpretation of its statute, and such decisions are not disregarded unless they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable." *Bellas v. CBS, Inc.,* 221 F.3d 517, 530 (3d Cir.2000) (applying *Christensen* to IRS General Counsel Memorandum statutory interpretations). In *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001), the Supreme Court declined to consider whether "Revenue Rulings" are entitled to deference, but held that a long and consistently-held IRS interpretation of the Code or its regulations is entitled to "substantial judicial deference" if it is reasonable. *Id.* See also *Vons Companies, Inc. v. United States,* 51 Fed.Cl. 1, 8 n. 5 (2001). With respect to the interpretation at issue in this case, it is one the Court would have reached without the 1997 IRS Paper, in light of the statute and other legislative history. Consequently, the Court believes that the IRS interpretation is not unreasonable and is therefore entitled to whatever deference may

exist for the type of opinion in which the interpretation is offered.

Iowa 80 also argues that the additional services that it provides in its Main Buildings in Walcott and Joplin are necessary to sell petroleum to its customers. Iowa 80 further points out that its larger corporate competitors house all of these services in one building, along with where they sell gas. Iowa 80 further points out that this statutory and regulatory regime was crafted as a result of the lobbying efforts of their large corporate competitors and it is tailored to their needs, potentially leaving Iowa 80 in the lurch.

This Court does not deny the necessity for a modern truckstop to provide the services that are provided in the Main Buildings in Walcott and Joplin. Nor does this Court deny that bundling these services into a single building with all petroleum sales, as opposed to using separate buildings, as Iowa 80 does in Walcott and Joplin, provides a tax advantage under the current statutory and regulatory regime. Finally, this Court does not deny the potential of the legislative and regulatory process for catering to the needs of a select group rather than the overall public interest. Nevertheless, none of these valid complaints license this Court to enact an interpretation other than that which was clearly intended. If Iowa 80 contends that the statutes and regulations governing the classification of "retail motor fuel outlets" violate the policy which motivate them, the forum for that contention is Congress, not this Court.

 The accounting provided with respect to the Main Buildings in both Walcott and Joplin is unfortunately incomplete in both cases. In the case of Joplin, a genuine issue of fact remains as to whether or not diesel fuel was sold at the Main Building and if so how much. Furthermore, there is no clear separation between

non-petroleum related gross revenues derived from the Main Building in Joplin and other buildings at Joplin. Consequently, in the case of Joplin, the Court cannot grant summary judgment. In the case of Walcott, there are similar problems with respect to whether non-petroleum related revenues are derived from the Main Building in Walcott or other buildings in Walcott. Nonetheless, it is clear that gross revenues attributable to non-petroleum related lessees alone exceed the amounts of petroleum sales admitted by Iowa 80. Consequently, regardless of what non-petroleum related gross revenues are directly earned by Iowa 80 in the Main Building in Walcott, it is clear that the petroleum-related gross revenues in that building constitute less than 50% of all gross revenues attributable to that building. Summary judgment is therefore granted with respect to Iowa 80's facility in Walcott.

### B. The 50% Floor Space Test and the Doctrine of Variance

■ Iowa 80 now also seeks, in the alternative, to classify its Main Buildings in Walcott and Joplin as "retail motor fuel outlets" by claiming that 50% or more of the floor space in those buildings are devoted to the marketing of petroleum. The United States argues that because Iowa 80 did not properly raise this issue in its administrative claim with the IRS, this Court does not have subject matter jurisdiction to review it. Iowa 80 argues that by raising the issue of whether the Main Buildings qualify as "retail motor fuels outlets" pursuant to 26 U.S.C. § 168(e)(3)(E)(iii), it has sufficiently identified the grounds in its administrative claim on which it now litigates.

■ Federal law prohibits any lawsuit "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary or his delegate according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof." 26 U.S.C. § 7422(a); see also *Bohn v. United States*, 467 F.2d 1278, 1279 (8th Cir.1972). Under Internal Revenue Service regulations a claim "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." 26 C.F.R. § 301.6402–2(b)(1). "The Code's requirement of detail in setting forth an administrative claim must be strictly applied, as it operates as a jurisdictional limitation on courts vested with authority to entertain tax refund cases." *Nucorp, Inc. v. United States*, 23 Cl.Ct. 234, 238 (1991). "The filing of a claim allows the IRS to investigate, make an administrative determination of the taxpayer's liability, and possibly avoid court action. The claim 'advise(s) the appropriate officials of the demands or claims intended to be asserted, so as to insure an orderly administration of the revenue . . .'" *Shanker v. United States*, 571 F.2d 8, 10 (8th Cir.1978).

Iowa 80 raises a legitimate and worthwhile question about how broadly a Court should construe the "grounds" raised in a taxpayer's administrative claim that would sufficiently apprise the Commissioner of the exact basis of the taxpayer's claim. Iowa 80 points to *First Nat. Bank of Fayetteville, Arkansas v. United States*, 727 F.2d 741 (8th Cir.1984), where a taxpayer brought a claim under 26 U.S.C. § 2055(e)(3) and was ultimately awarded a refund based on the inapplicability of § 2055(e)(2). The Eighth Circuit, on appeal, held that the taxpayer's claim was a sufficient basis for the lawsuit because it raised the issue of the applicability of 26 U.S.C. § 2055(e). See also *Jones v. United States*, 2000 WL 33340303 (D.N.D.) ("[C]ase law in the Eighth Circuit has

suggested that putting the IRS on notice of the nature of the claim may be sufficient.")

 Nevertheless, whether the grounds cited in a taxpayer's administrative claim are sufficiently expansive to provide sufficient notice arguments raised in litigation is, without a doubt, a difficult and case specific question. "Clearly, a taxpayer may not raise a new ground for refund at trial when the Service had no opportunity to investigate the ground administratively." *First Nat. Bank of Ft. Smith v. United States*, 610 F.Supp. 933, 936 (W.D.Ark.1985) (citing *Real Estate Title Co. v. United States*, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542 (1940)); see also *Beckwith Realty, Inc. v. United States*, 896 F.2d 860, 862 (4th Cir.1990) ("[T]he claim for a refund must contain sufficient information to allow the [IRS] to address the merits of the dispute."). The IRS "is not required to ferret out on its own the specific claims advanced by the taxpayer." *First Nat. Bank of Ft. Smith* at 937. "A civil refund suit will not stand where the administrative claim is so vague or so general that the [IRS] 'could only guess at the nature of the taxpayer's claim.'" *Meisner v. United States*, 1996 WL 442717 (D.Neb. 1996) (quoting *First Nat. Bank of Ft. Smith* at 937). In *U.S. Bank v. United States*, 74 F.Supp.2d 934, 936 (D. Neb. 1999), the district court rejected the argument that "federal courts only require notice pleading and that requiring the taxpayer to use 'magic words' creates unfair prejudice to the taxpayer." In *Meisner*, the district court stated that "the plaintiff's citation to the Internal Revenue Code and regulations shed no light as to the kind or extent of her claimed deduction. In addition, plaintiff offered no facts or documents to support this theory." *Meisner* at *5.

In this case, Iowa 80 relies to a great extent on the fact that the statutory provision cited in its administrative claim covers all of its arguments in this litigation. The case law in the Eighth Circuit does not appear to favor the position that this is sufficient notice. Nevertheless, even if Iowa 80's citation of 26 U.S.C. § 168(e)(3)(E)(iii) did constitute setting forth "in detail each ground upon which a credit or refund is claimed" pursuant to 26 C.F.R. § 301.6402–2(b)(1), Iowa 80 has clearly failed to set forth "facts sufficient to apprise the [IRS] of the exact basis thereof." 26 C.F.R. § 301.6402–2(b)(1); see also *Meisner* at *5. Iowa 80 has presented no evidence that it provided any factual support to the IRS in its administrative claim that the Main Buildings in Walcott and Joplin would pass the 50% floor space test.

 Finally, Iowa 80 argues that the United States waived the variance defense on this issue for two reasons. First, the agent examining Iowa 80's administrative claim, Mr. Kueter, briefly addressed the floor space issue. Second, the United States has requested information on the floor space issue in this case. With respect to agent Kueter's comments, they appear to be an attempt to narrow the grounds for recovery sought by Iowa 80. After making one cursory comment on the issue, not based on evidence presented by Iowa 80, agent Kueter stated that "[i]t is believed that the taxpayer will not attempt to show that this test could be met." Neither agent Kueter's summary rejection of the floor space test as a possible ground for recovery nor agent Kueter's stated belief that Iowa 80 would not pursue that ground was questioned in Iowa 80's administrative appeal of his finding.

With respect to the discovery taken by the United States in this lawsuit, the Court does not find that this constitutes a waiver of the variance defense. In *Mallette Bros. Construction Co., Inc. v. United States*, 695 F.2d 145, 157 (5th Cir.1983), the Fifth

Circuit held that the United States did not waive its variance defense by addressing an issue at trial and submitting evidence with respect to the issue. The Fifth Circuit argued that holding that such actions constitute a waiver of the variance defense would present the United States with "a Hobson's choice."

> They would have either to stand on the variance (and thus possibly lose the issue on the merits at trial level) and then appeal on the variance question, possibly requiring another trial, or abandon the variance argument in the hopes of prevailing on the merits, thereby obviating the necessity of an appeal and another trial.

*Mallette Bros. Construction Co., Inc.* at 157. The United States correctly argues in this case that, as in *Mallette*, the Court should not force it to choose between pursuing its right to prepare for the merits of all claims against it and raising a valid jurisdictional defense. More importantly, since the variance defense stems from a challenge to the Court's subject matter jurisdiction, which can never be waived, it would seem that waiver should not apply unless the United States raises it after judgment, as in *First Nat. Bank of Fayetteville, Arkansas v. United States.*

## C. The "Five Critical Factor Test"

The variance doctrine discussed above would also bar the "five critical factor" test offered by Iowa 80. Even if the doctrine of variance did not bar the application of this test, the fact that this test was entirely fabricated by Iowa 80 would preclude its application. The gossamer on which Iowa 80 bases this argument is the statement of policy that underlies the promulgation of the Two–Prong test that is endorsed by Congress. Iowa 80 derives the "five critical factors" from this policy discussion. There is no place in the 1995 IRS Paper where the IRS suggests that these policy considerations form a threshold for application of the Two Pronged test. The Senate Committee Report, which alters the test promulgated by the 1995 IRS Paper, not only fails to mention a "critical factor" threshold, it explicitly says that "property not meeting the test will not qualify as a retail motor fuels outlet." The subsequently issued 1997 IRS Paper does not even contain all of the "critical factors" listed in the 1995 IRS Paper.

Thus, this Court finds that the legislative history demonstrates that the clear intent of Congress was to apply the Two–Prong test to all gas station and truck-stop properties. In arguing that the Court should more narrowly construe Congressional intent as to when to apply the Two–Prong test, Iowa 80 puts forward evidence such as what services are traditionally available at truckstops, the ability of the Main Buildings to adapt to different purposes, and of certain types of groceries that are generally available that are not offered in the Main Buildings. To the Court, this evidence convincingly demonstrates why the Two Pronged test was enacted: so that the IRS and courts are spared from investigating what types of groceries buildings at truckstops offer that are not available in the local supermarket, investigating whether these buildings are architecturally adaptable to other purposes, or investigating whether these buildings offer services that were traditionally offered thirty-five years ago.

## IV. Order

The United States motion for summary judgment is granted with respect to all claims involving the Walcott, Iowa facility. The United States motion for summary judgment is also granted with respect to all claims involving whether the Joplin, Missouri installation is a "retail motor fuels outlet" due to a devotion of 50% or

more of its floor space to the marketing of petroleum or whether it meets "critical factors" discussed in IRS Policy Statements. The United States motion for summary judgment is denied with respect to Iowa 80's claim that it meets the 50% gross revenue test at its Joplin, Missouri installation.

IT IS SO ORDERED.